**In re Jeffrey D. STEWART, Debtor.**

**Jeffrey D. STEWART, Appellant,**

v.

**UNITED STATES TRUSTEE, Appellee.**

BAP No. 97–010.
Bankruptcy No. 96–01624–W.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Dec. 9, 1997.

Richard A. Shallcross of Brewster, Shall-cross & DeAngelis, Tulsa, OK, for Appellant.

Katherine M. Vance, Assistant United States Trustee, Tulsa, OK (John E. Foulston, United States Trustee, Wichita, KS; Richard A. Wieland, Wichita, KS; Martha L. Davis, General Counsel; Jeanne M. Crouse, Attorney, Executive Office of United States Trust-

ee, Washington, DC, with her on the brief), for Appellee.

Before CLARK, ROBINSON and MATHESON, Bankruptcy Judges.

## OPINION

ROBINSON, Bankruptcy Judge.

The debtor, Jeffrey D. Stewart, appeals two orders of the United States Bankruptcy Court for the Northern District of Oklahoma. The first order dismisses his bankruptcy proceeding as a substantial abuse of the provisions of Chapter 7 pursuant to 11 U.S.C. § 707(b), and the second order concludes that the statute is constitutional.[1] The debtor contends that the Bankruptcy Court erred: in allowing the United States Trustee to commence a § 707(b) action based on the suggestion or request of a creditor; in concluding that § 707(b) is not constitutionally infirm for violating the equal protection guarantees of the Fourteenth and Fifth Amendments of the United States Constitution nor void for vagueness; in finding that his debts were "primarily consumer debts"; and in concluding that his case was a substantial abuse of the provisions of Chapter 7. For the reasons set forth below, we affirm the Bankruptcy Court.

## I. JURISDICTION AND SCOPE OF REVIEW

▮▮▮ The debtor filed a timely Notice of Appeal from final orders of the Bankruptcy Court. This Court has jurisdiction under 28 U.S.C. § 158(c). We review the Bankruptcy Court's conclusions of law *de novo*. *Tulsa Energy, Inc. v. KPL Prod. Co. (In re Tulsa Energy, Inc.)*, 111 F.3d 88, 89 (10th Cir. 1997). The Bankruptcy Court's findings of fact will be rejected only if clearly erroneous. *Id.* Mixed questions of law and fact will be reviewed for clear error if the question is primarily factual and if the facts satisfy the proper legal standard. *See Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d

1330, 1338–39 (10th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996). Whether the court applied the proper legal standard or conclusions is subject to *de novo* review. When factual findings are premised on a proper legal standard that was improperly applied, factual findings are not entitled to the protection of the clearly erroneous standard, but are subject to *de novo* review. *Sender v. Johnson (In re Hedged–Invs. Assocs., Inc.)*, 84 F.3d 1267, 1268 (10th Cir.1996).

## II. BACKGROUND

The Bankruptcy Court's findings of fact are set forth in detail in *Stewart I*, 201 B.R. at 997–1002. With some notable exceptions, discussed below, we adopt the findings of fact, summarized as follows. The debtor, Jeffrey Stewart, married Barbara Teichner in 1978. During the first 10 years of their marriage, Stewart held various jobs and periodically went to college. During these years, they had four children and the family's standard of living was minimal. Barbara's parents helped by lending them money, which they used partly for living expenses and partly for Stewart's schooling. Stewart also obtained student loans from commercial lenders under government-sponsored programs. In 1988, Stewart entered medical school at the age of 30. In 1990, Stewart commenced a romance with Patricia, a fellow medical student; and Stewart and Barbara soon divorced. As part of the separation and divorce, Stewart signed promissory notes to Barbara's parents for the loans they made to them during their 12-year marriage. The divorce decree required Stewart to pay Barbara $500 in monthly alimony until he completed an accredited medical residency, and $25,000 in annual alimony thereafter, with a cap of $2 million (or $250,000 in the event Barbara remarried). Stewart was also required to pay child support of $2,000 per month, as well as the children's medical and educational expenses.

---

1. The orders appealed from are published at *In re Stewart,* 201 B.R. 996 (Bankr.N.D.Okla.1996) ("*Stewart I*") (dismissing debtor's case for substantial abuse of provisions of Chapter 7); and *In re Stewart,* 204 B.R. 780 (Bankr.N.D.Okla.1997)

("*Stewart II*") (holding that § 707(b) does not violate the equal protection guarantees of the Fourteenth and Fifth Amendments of the United States Constitution, and rejecting debtor's void-for-vagueness argument).

In 1992, Stewart graduated from medical school and commenced his internship and residency program. In June, 1996, he completed his residency in obstetrics-gynecology. After he completed the residency, Stewart delayed his practice and entered a two to three year fellowship program in perinatology, training for high risk obstetrics. During the fellowship, his base salary contract will range from $34,292 to $37,000. Current starting salaries for program graduates not yet board certified was estimated at $100,000 to $150,000 annually. Average annual earnings for board certified ob/gyn specialists range from $175,000 to $325,000, and the highest salaries exceed $500,000.

On May 2, 1996, Stewart filed a Chapter 7 petition in bankruptcy.[2] Stewart scheduled $23,066 in assets, which included partial interests in 22 tracts of real estate, as well as a 1990 Range Rover and a 1978 Datsun. Stewart scheduled debts totaling $2,548,440.37; all but $15,244 of this debt was unsecured or priority debt. The scheduled debt included $2,000,000 owed to Barbara, $272,133 in known student loans plus several unknown amounts, and $230,000 owing to Barbara's parents.

After the United States Trustee filed a motion to dismiss, Stewart amended his bankruptcy schedules, slightly decreasing the value of his assets, and increasing his liabilities to $2.6 million. He moved his $2 million debt to his ex-wife from Schedule F to Schedule E (which had been omitted from the original schedules). In his Schedule E he reported claims totaling $2,004,500, consisting of Barbara's claim (still listed at $2 million) plus $4,500 in federal and state taxes. His amended Schedule F increased his debt owed to his former in-laws to about $320,000 and claimed student loans of about $218,000, with a total general unsecured debt of $582,509. The Bankruptcy Court noted that although Stewart had set Barbara's claim at $2 million, Barbara had remarried, and thus her claim must be reduced to $250,000.

Stewart further amended his schedules claiming monthly take home pay of $2,556, with a projection showing average monthly income in 1996 of $3,403. The amended schedules listed monthly expenses of $7,966, for a monthly deficit of income under expenses of $4,563.

Stewart's total debts are approximately $837,009[3], including the $250,000[4] marital debt to Barbara, the $218,000 in student loans from commercial lenders, and the $320,000 debt to his former in-laws. Half of the total debt amount of $837,009 is about $418,505. The marital debt of $250,000 plus the $320,000 owed to the former in-laws exceeds half; or the $218,000 student loan debt plus either the $320,000 owed to the former in-laws, or the $250,000 in marital debt, exceeds half of the total debt.

The Bankruptcy Court relied on the following findings of fact in reaching the conclusion that there was substantial abuse:

(1) The debtor, along with his doctor wife, have considerable future earning potential (201 B.R. at 1006);

2. By then, he had married Patricia, who had filed her own Chapter 7 shortly after she graduated from medical school. She obtained a discharge in 1995, before she and Stewart married but while they were cohabitating.

3. At trial, debtor testified that his total debt was $786,714. However, the schedules show total unsecured, nonpriority debt of $582,509, and priority debt of $2,004,500. When the $2,000,000 debt is reduced to $250,000, the total debt, per the schedules, would be $837,009. We will use this figure even though there was testimony that some of the debts, e.g., the $7,900 debt for attorney's fees, may have been overstated.

4. Stewart's brief lists possible consumer debts to his ex-wife in the amount of $250,000, but notes that this amount should be reduced by approximately $12,000 previously paid to her. Barbara also received a judgment in the amount of $26,-

077.95 for unpaid alimony and unreimbursed children's medical expenses. The Bankruptcy Court noted that Stewart owes his children $8,000 for past due medical bills, which is included in Barbara's judgment against him. Thus, it appears that the Bankruptcy Court used the $250,000 figure plus $8,000 of the judgment amount in determining Stewart's debts. Barbara testified that the $238,000 figure includes the portion of the judgment for unpaid alimony. See Appellant's Appendix, Tab 47, Transcript of Proceedings Held October 1, 1996 ("Transcript"), p. 220. Because the result will be the same using either the $250,000 figure or the $238,000 figure and regardless of whether the judgment amount is added to the marital debt, we will use the $250,000 figure for the sake of simplicity.

(2) The student loan debts are not dischargeable, and the main effect of the case would be to discharge the debtor's debts to his former wife and her parents and his children, which he appears to have "no intention of honoring" (*id.*);

(3) The debtor exaggerated his debts and expenses and minimized his income. While he was not required to include his non-debtor wife's income in his schedules, his failure to do so presented a "seriously misleading picture of his actual financial status" (*id.*);

(4) The debtor's lifestyle was extravagant—he spends $4,500 more than he takes home every month (*id.* at 1007);

(5) His new wife obtained a chapter 7 discharge under effectively fraudulent circumstances just prior to marrying the debtor (*id.*);

(6) Although the debtor is ineligible for Chapter 13 relief, Chapter 11 is available to him (*id.*);

(7) There was no emergency, disaster, or untenable situation to be remedied when he filed bankruptcy (*id.*); and

(8) "Ch. 7 relief would result in little or no dividend to creditors, and would amount to a reward for Stewart's own financial improvidence and judicial blessing of an unconscionably one-sided, opportunistic adjustment of Stewart's relationship with his domestic creditors" (*id.* at 1008).

*Stewart I,* 201 B.R. at 1006–1008. The debtor contests findings (2), (3), (5), and (6).

With regard to finding (2), Stewart argues that the Bankruptcy Court's finding that he had no intention of honoring his child support obligations is baseless. However, the Bankruptcy Court found that he had no intention of honoring the notes to his in-laws, nor his marital and child support obligations, based on the course of the state court litigation, the timing of his petition in bankruptcy, and other circumstances (such as buying an expensive recreational vehicle while refusing to pay his children's medical bills). Stewart testified that he is not seeking to discharge his guaranteed student loans. *See* Transcript, p. 139. Stewart also testified that he wants Barbara to pay her share of the chil-

dren's educational expenses even though he is obligated to pay the full amount. *Id.* at p. 200–01. We do not find that the Bankruptcy Court clearly erred with regard to finding (2).

However, we find no support in the record for finding (3). The Bankruptcy Court found that the debtor exaggerated his debts and expenses and minimized the income he disclosed and that his failure to include Patricia's income and expenses presented "a seriously misleading picture of his actual financial status." Although Stewart did not include Patricia's income in his schedules, he did distinguish total household expenses from his share of the expenses. He also submitted her 1995 Form 1040–A as an exhibit at trial. *See id.* at p. 164.

Although Stewart scheduled Barbara's debt at $2,000,000, and scheduled various medical bills that had been paid by Barbara, he did attempt to provide an explanation regarding these debts. *See id.* at pp. 37, 41, 141–43. Stewart testified that he scheduled Barbara's debt at $2,000,000, instead of $250,000 due to her remarriage, because he was not sure of the ramifications if her husband died or she subsequently divorced. *See id.* at pp. 46, 95. Even though Barbara had paid the medical bills that Stewart listed, she currently has a judgment for reimbursement of these amounts from Stewart. Stewart did not separately list the judgment as a debt, and there was conflicting testimony as to whether the judgment amount was in addition to or subject to the $250,000 ceiling. *See id.* at pp. 139, 193, 220. There was also testimony regarding a debt for attorney's fees that was scheduled at $7,900, even though the state court had reduced the amount to $2,000. *See id.* at p. 45. Stewart testified that because the appeal time on the order reducing the amount had not run when he filed bankruptcy, he listed the larger amount. *See id.* at p. 82. However, the appeal time had run by the time Stewart filed his amended schedules on July 15, 1996. *See id.* at p. 181.

The record does not support a finding that Stewart exaggerated his actual expenses. He testified that the $800 a month food expense for him and his wife was high due to

the fact that they are forced to eat a large portion of their meals at the hospital cafeteria. *See id.* at p. 56. Furthermore, their job situations require them to maintain two separate residences. However, even though we find that Stewart did not exaggerate his actual expenses, we do find that his actual expenses appear to be excessive. His monthly expenses, which include a $631 car payment, exceed his monthly income by more than $4,500.

With regard to finding (5), the record likewise does not support a finding that Patricia's Chapter 7 discharge was effectively fraudulent. Although the Bankruptcy Court took judicial notice of Patricia's bankruptcy file, Patricia did not testify, and the debtor testified that he did not help her fill out her schedules and that she went to an attorney on her own. *See* Transcript, p. 201–02.

With regard to finding (6), the debtor argues that the United States Trustee did not prove that Chapter 11 was an option for the debtor. The discussion regarding the option of using Chapter 11 was an apparent response to the debtor's argument that he was not eligible for Chapter 13 relief. Because we adopt the totality of the circumstances test and find that eligibility for Chapter 13 relief is only one of many factors to consider, the Bankruptcy Court's findings regarding Chapter 11 relief is not relevant to the Court's inquiry.[5]

## III. DISCUSSION

A. *The Bankruptcy Court did not err in allowing the United States Trustee to commence a § 707(b) action based on the suggestion or request of a creditor.*

■ The debtor contends that the Bankruptcy Court initially erred in failing to dismiss the United States Trustee's § 707(b) action, which was tainted inasmuch as his ex-wife requested or suggested that a § 707(b) action be commenced.[6] Section 707(b) states that "the court, on its own motion or on a motion by the United States Trustee, but not at the request or suggestion of any party in interest, may dismiss a case." The debtor contends that the language "not at the request or suggestion of any party in interest" modifies the preceding language such that the United States Trustee may not initiate a motion at the request or suggestion of a creditor. *See In re Restea,* 76 B.R. 728, 732–33 (Bankr.D.S.D.1987) (refusing to consider § 707(b) motion when creditors suggested to United States Trustee that it should investigate the case for abuse). The Bankruptcy Court rejected this interpretation, stating

> Stewart misreads the language of the statute. The phrase "but not at the request or suggestion of any party in interest" modifies "court", not "United States Trustee". The statute requires the *court* to refuse to entertain any motion to dismiss under § 707(b), however disguised, which is brought before the Court by anyone other than the UST. It does not require the *UST* to try to do its duty from an ivory tower.

*Stewart I,* 201 B.R. at 1003.

■ We review *de novo* the Bankruptcy Court's interpretation of this language, and conclude that while the subject language limits who may file the motion, it does not limit the source of information or factual basis on which the United States Trustee or the court may initiate a § 707(b) motion. If the debtor's interpretation is correct, the court's au-

5. *See In re Krohn,* 886 F.2d 123, 127 (6th Cir. 1989) (noting that eligibility for Chapter 13 should not be dispositive; allowing those whose high unsecured indebtedness renders them ineligible for Chapter 13 treatment to avoid § 707(b) dismissal would have the anomalous result of rewarding outrageous abusers of consumer credit, while denying the benefits of Chapter 7 to those with more moderate consumer debt). Although the Bankruptcy Court found that Chapter 11 was available to the debtor, it failed to consider other material factors such as whether the creditors would accept the debtor's plan or whether a cram down would be possible; this analysis would be purely speculative. Because

eligibility for Chapter 13 relief is only one of many factors to consider, we find that analyzing whether Chapter 11 is a realistic alternative is unnecessary in determining substantial abuse.

6. In his brief, the debtor contests an order entered on August 30, 1996, striking his third affirmative defense of "taint." Appellant's Brief, pp. 7 & 18. The Bankruptcy Court also denied a motion to reconsider this order. Both orders are included in the Appendix at Tabs 26 and 47. We reach this issue as it has merged into the appeal of the merits of the dismissal under § 707(b).

thority to initiate a § 707(b) action *sua sponte* would similarly be limited. Surely the effectiveness of this statute would be stymied if the court or United States Trustee were limited to the petition, schedules, pleadings and record in determining whether a § 707(b) motion should be filed. Often such motions are filed precisely because information extraneous to the record evidences a financial picture different than that depicted in the bankruptcy record. Such information may be unknown or unavailable without the input of creditors. Although creditors may not enforce § 707(b), they may certainly provide information to the United States Trustee or court for their analysis. *See United States Trustee v. Clark (In re Clark)*, 927 F.2d 793, 797 (4th Cir.1991); *In re Morris*, 153 B.R. 559, 563 (Bankr.D.Or.1993) (finding that a § 707(b) action is not tainted if based on a creditor's suggestion because the United States Trustee has the duty to independently investigate any allegations of substantial abuse prior to filing the motion); *see also United States Trustee v. Joseph (In re Joseph)*, 208 B.R. 55, 59–60 (9th Cir. BAP 1997) (holding that the United States Trustee may bring a § 707(b) motion upon referral from panel trustee).

■ In this case, the United States Trustee did not rely solely on information provided by the debtor's ex-wife, but also relied on information from the debtor's schedules, and information concerning the debtor's income potential. The record demonstrates that the United States Trustee undertook an independent investigation of Barbara's allegations, and thereby complied with its duties and responsibilities.

B. *The Bankruptcy Court did not err in concluding that § 707(b) is constitutional.*

The debtor also contends that § 707(b) is unconstitutional because it violates the equal protection guarantees by discriminating against consumer debtors; and violates the due process guarantees by ambiguity rendering it void for vagueness. He argues that the statute is in derogation of the Fourteenth[7] and Fifth Amendments to the United States Constitution as there exists no rational basis for Congress to discriminate in its application of § 707(b) to consumer debtors, but not business debtors. We review this question of law *de novo* and conclude that the Bankruptcy Court did not err in determining that the statute is constitutional.

■ We agree with the reasoning set forth in *In re Keniston*, 85 B.R. 202 (Bankr.D.N.H. 1988), and conclude that by adopting a totality of the circumstances test in interpreting "substantial abuse," courts are basically reviewing a case for dismissal in much the same manner applicable to business debtors under §§ 105(a) and 707(a) of the Bankruptcy Code. *Id.* at 223. In *Keniston*, the court noted that reading § 707(b) as disqualifying consumer debtors for Chapter 7 relief merely upon a showing of ability to repay debts out of future income presents a substantial equal protection issue. *Id.* at 212. However, the court found that a permissible statutory construction avoided the necessity of reaching the constitutional question. *Id.* at 203. Specifically, the court found that by adopting a narrow construction of § 707(b) that allows for a case-by-case analysis, rather than a rigid predetermined test keyed to future income alone, the dismissal power under § 707(b) is not essentially different from the established power of a bankruptcy court to dismiss a petition under any chapter of the Bankruptcy Code that is filed with a lack of good faith or as an abuse of the process under §§ 105(a) and 707(a) of the Code. *Id.* at 222–23. The Bankruptcy Court's decision in *Stewart II* followed a similar analysis. The Bankruptcy Court found that § 707(b) neither requires nor prevents dismissal of business debtor's cases for abuse, and bankruptcy courts have long had the power and duty to prevent abuse of their jurisdiction by debtors who choose relief under " 'the wrong chapter.' " *Stewart II*, 204 B.R. at 782 (quoting *In re Higginbotham*, 111 B.R. 955, 961–64 (Bankr.N.D.Okla.1990)).

---

**7.** We note that the equal protection guarantee in the Fourteenth Amendment applies to state action; and equal protection guarantees apply to

Congressional action through the due process clause of the Fifth Amendment. *See In re Keniston*, 85 B.R. 202, 205 (Bankr.D.N.H.1988).

By adopting a "totality of circumstances" test, as discussed below, we are basically reviewing a case for dismissal in much the same manner applicable to business debtors under §§ 105(a) and 707(a) of the Bankruptcy Code. This interpretation construes the statute in such a way as to avoid the necessity of deciding the equal protection question.

■ The debtor further argues that § 707(b) is unconstitutionally vague, and that the terms "primarily consumer debts," "consumer debts," and "substantial abuse" are so vague that they render the statute meaningless and unenforceable. We review this question of law *de novo* and conclude that the Bankruptcy Court did not err in determining that the statute is not void for vagueness.

The Bankruptcy Court in *Stewart II* incorporated by reference its earlier decision in *In re Higginbotham,* 111 B.R. 955 (Bankr. N.D.Okla.1990). In *Higginbotham,* the court noted that civil statutes, such as § 707(b), are subject to less rigorous constitutional standards than criminal statutes, and noted that where First Amendment freedoms are not concerned, the rule is that a statute is unconstitutionally vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Id.* at 965 (citations omitted). The court then noted that

> Section 707(b) does provide a standard, even though the details must be worked out by judicial decisions. This is not uncommon—"fraud" and "good faith" are such terms; so is "due process" itself. Debtors protest that judges will define and apply the substantial-abuse standard "in an arbitrary and unequal fashion".... No doubt judges will apply it unequally, so long as judges remain human—this cannot be helped and is a problem not confined to § 707(b). But "unequal" is not necessarily "arbitrary or capricious." If the possibility of judicial difference of opinion violates equal protection, then pretty much all of our law, statutory or otherwise, is unconstitutional. We strive toward a government of laws, not men; but we cannot have a government of robots. Although

§ 707(b) unavoidably subjects debtors to judicial difference of opinion, it does not subject them to judicial whim without "guidance or constraint,"*Yick Wo v. Hopkins,* 118 U.S. [356,] at 367, 6 S.Ct. [1064,] at 1069, 30 L.Ed. 220 [ (1889) ]. While the statute might have been more specific, it is definite enough to pass Constitutional muster in this regard.

*Id.* at 966 (citations omitted); *see also Zolg v. Kelly (In re Kelly),* 841 F.2d 908, 916 (9th Cir.1988) (finding § 707(b) not void for vagueness and noting that "[t]he Constitution does not require the legislature to incorporate *Webster's* into each statute in order to insulate it from vagueness challenges"); *Heller v. Foulston (In re Heller),* 160 B.R. 655, 661–62 (D.Kan.1993); *In re Wilkes,* 114 B.R. 551, 553 (Bankr.W.D.Tenn.1989) (noting that while the statute "may present an 'undefined standard for decision' such a statute may derive much meaningful content from its legislative purpose, its factual background, and its statutory context" (quoting *Kelly,* 841 F.2d at 916)).

C. *The Bankruptcy Court did not err in finding that Stewart's debts were primarily consumer debts.*

Section 707(b) applies to "an individual debtor under this chapter whose debts are primarily consumer debts." The debtor contends that the Bankruptcy Court erred in applying § 707(b) to him by relying on loans from commercial lenders and his former in-laws that were not consumer debts, but business debts incurred to pay for his college and medical school education. The Bankruptcy Court found that student loans are consumer debts. The debtor voluntarily incurred these debts "in hopes of enhancing those most personal of qualities, the functioning of his own mind and his own hands, and thereby benefiting himself, his family and his household for the rest of his life." *Stewart I,* 201 B.R. at 1004. Thus, the Bankruptcy Court concluded that student loans are consumer debts whether they are used directly to pay tuition or indirectly to pay living expenses during the period of schooling. The Bankruptcy Court concluded that "[d]ebts for loans which further that 'personal' endeavor, whether the source of the money be institu-

tional or intra-family, come within the literal terms of 'consumer debt' as defined in § 101(8), and within probable Congressional intent in employing such term(s) in § 707(b)." *Id.* at 1005. In so holding, the Bankruptcy Court noted that profit motive may be an element, but is not determinative of whether a debt is a consumer debt. Furthermore, the Bankruptcy Court noted that the debtor testified that his education was important for reasons outside of his earning potential; thus, there was no profit motive. *Id.* But, on a whole, the Bankruptcy Court criticized this test stating that it is not expressed in § 101(8) and that almost any debt is based on some profit motive.

Section 101(8) defines "consumer debt" as "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). The Tenth Circuit has not interpreted the definition of "consumer debts" set forth in § 101(8) in the context of § 707(b). *But see Citizens Nat'l Bank v. Burns (In re Burns),* 894 F.2d 361 (10th Cir.1990) (discussing "consumer debt" under § 523(d)).

■ Section 101(8) requires that the court consider the purpose for which the debt was incurred, and where the debt was incurred for more than one purpose, deems that the primary purpose of the debt will determine its nature. *See 2 Collier on Bankruptcy* ¶ 101.08, at 101–47 (Lawrence P. King ed., 15th ed. rev. 1997) ("If a debt is incurred partly for business purposes and partly for personal, family or household purposes, the term 'primarily' in the definition suggests that whether the debt is a 'consumer debt' should depend upon which purpose predominates. Presumably, this determination would normally turn on the purpose for which most of the funds were obtained." (footnote omitted)). Profit motive may be considered. *Burns,* 894 F.2d at 363 (holding that "a credit transaction is not a consumer debt when it is incurred with a profit motive"). The debtor concedes that although he used the family and commercial loans to finance his education, he also used them to support his family.

Most courts, like the court in *In re Gentri,* 185 B.R. 368, 373 (Bankr.M.D.Fla.1995), as-

sume, but do not analyze, whether student loans are "consumer debts." *See In re Dickerson,* 193 B.R. 67, 70 (Bankr.M.D.Fla.1996); *In re Chapman,* 146 B.R. 411, 416 (Bankr. N.D.Ill.1992). But at least one court has held, similar to the Bankruptcy Court, that student loans may be "consumer debts." *In re Vianese,* 192 B.R. 61, 68 (Bankr.N.D.N.Y. 1996) (holding that student loans for debtor's son's education were for "family purposes" and should be considered consumer debt).

■ We conclude that student loans are not consumer debts per se. The primary purpose for which the debt was incurred must be determinative. There may be circumstances in which the debtor can demonstrate that the student loan was incurred purely or primarily as a business investment, albeit an investment in herself or himself, much like a loan incurred for a new business.

■ The Bankruptcy Court found that both the debt to the former in-laws and the student loan debt were consumer debts, as the majority of monies received were used for family living expenses and only a minority amount of the monies received were used for direct educational costs. *Stewart I,* 201 B.R. at 1003. With regard to the debt to the former in-laws, we find that the debtor's own testimony and other parts of the record support this finding. Stewart testified that the money borrowed from Mr. and Mrs. Teichner was used to support Stewart's family so that he could attend school, and was used for anything they needed to pay, including house payments, groceries, pre-school, children's activities, moving expenses, and family vacations. *See* Transcript, p. 49–50. Barbara testified that her parents loaned money to Stewart's family mostly for living expenses, and to facilitate Stewart's education while maintaining his family in a 'certain life style' that would otherwise have been beyond their reach. *See* Transcript, pp. 213–16. As such, it seems clear that the entire debt to the former in-laws can be classified as a consumer debt under § 101(8).

■ The record on the institutional student loans is not as clear. The debtor testified that his original student loans, commencing in 1976 before he was married, were used

solely for tuition and room and board. *See* Transcript, p. 53. However, he further testified that from the fall of 1990 to the spring of 1991, he obtained $51,515 in student loans. Of this amount, $30,000 was paid to Barbara for support obligations, $11,000 was used for tuition, and Stewart lived on the remainder (about $7,000). *See id.* at p. 179. The next year, he obtained $52,404, with $30,000 again going to Barbara for support obligations, another $3,000 going towards the children's medical expenses, and the remaining $18,000 going towards tuition and Stewart's living expenses. *Id.* It thus appears that the debts to the institutional lenders had a dual use and a dual purpose, i.e. educational costs and living expenses. Moreover, Stewart testified that he was motivated to pursue a medical education for humanitarian reasons and that he was not motivated by an immediate high income. *See id.* at pp. 122, 125–26. Indeed, he has delayed high income to pursue a fellowship. Given this, the record demonstrates that the debt to the institutional lenders was used in part for family living expenses and incurred in part for personal reasons. Although the record is not clear as to their primary use and purpose, there was no clear error in the finding that these loans were consumer debts as well.

■ In any event, even if the institutional student loans are not consumer debts, other debts, upon which the Bankruptcy Court did not rely, clearly meet the definition of consumer debts. Stewart owes his ex-wife $250,000 in marital obligations arising out of their divorce. His counsel, in his opening remarks to the Bankruptcy Court, acknowledged that he had found no authority for characterizing the marital obligation as a business related debt. *See id.* at p. 14. Furthermore, we agree with the body of law holding that these types of debts are consumer debts, as they are for personal, family or household use. *See In re Traub,* 140 B.R. 286, 289 (Bankr.D.N.M.1992) (noting that "any debt to a former spouse which reflects the distribution of the net value of the community should always be classified as a consumer debt") (citing *In re Palmer,* 117 B.R. 443 (Bankr.N.D.Iowa 1990)).

■ Having defined which debts are consumer debts, we turn to the factual question of whether the debtor is an individual with "primarily" consumer debts. Courts have used several approaches in determining whether debtors have "primarily" consumer debts. Some courts have held that the statutory requirement is met when more than half of the dollar amount owed is consumer debt, while other courts also consider the number of consumer debts in addition to the dollar amount. *See In re Johnson,* 115 B.R. 159, 162 (Bankr.S.D.Ill.1990). We find that the statutory requirement is met if more than half of the dollar amount owed is consumer debt. The court in *Zolg v. Kelly (In re Kelly),* 841 F.2d 908, 913 (9th Cir.1988), noted that *Webster's Ninth New Collegiate Dictionary* 934 (1984), defines "primarily" as meaning "for the most part." The court in *Kelly* then held that when "the most part," i.e., more than half, of the dollar amount owed is consumer debt, the statutory threshold is passed. *Kelly,* 841 F.2d at 913. This interpretation is also consistent with the definition of consumer debt in § 101(8), which deems that a specific debt is a consumer debt if its primary purpose is consumer. The nature of a debt is controlled by its primary purpose and use. Consequently, in determining whether the total debts are primarily consumer in nature, the court should consider how these debts quantitatively compare with the debtor's total debt load.

In this case, we review the findings of the Bankruptcy Court for clear error. *Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.),* 84 F.3d 1330, 1338 (10th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996). The uncontroverted evidence at trial shows that the debtor's debts include approximately: $218,000 to commercial student loan lenders; $250,000 to his ex-wife as part of the divorce decree and property settlement; and a $320,000 debt for loans from his former in-laws. When the marital obligation is added to the $320,000 in debt to the former in-laws, the sum ($570,000) exceeds half of the $837,009 in total debt. Thus, Stewart's debts are primarily consumer debts.

**D.** *The Bankruptcy Court did not err in determining that the debtor's Chapter 7 case was a substantial abuse under § 707(b).*

Section 707(b) requires bankruptcy courts to make a finding of "substantial abuse." This is a mixed question of fact and law, requiring that factual findings be reviewed for clear error and conclusions of law be reviewed *de novo*. We have previously discussed the findings that are clearly erroneous. Adopting a totality of circumstances test, we conclude that the remaining findings of the Bankruptcy Court are not clearly erroneous and support a finding of substantial abuse.

Relevant factors for finding substantial abuse include: (1) circumstances surrounding the bankruptcy filing (*i.e.*, was it induced by emergency, sudden illness, disability, unemployment, etc.); (2) whether the debtor incurred cash advances and made consumer purchases far in excess of his or her ability to pay; (3) whether the debtor's budget is excessive or unreasonable; (4) whether the debtor's schedules and statement of income and expenses reasonably and accurately reflect his or her true financial condition; (5) whether the petition was filed in good faith; and (6) whether the debtor has the ability to repay. *See, e.g., Green v. Staples (In re Green)*, 934 F.2d 568, 572 (4th Cir. 1991).

The debtor seems to agree that the "totality of circumstances" test should be applied. *See* Appellant's Brief, p. 14. At the same time, however, the debtor argues that the United States Trustee had the burden to prove that he acted in bad faith, that he was not candid in reporting to the Bankruptcy Court, and that he was a candidate for any other chapter of the Code. Appellant's Brief, p. 16. Bad faith, inaccurate representations to the Bankruptcy Court, and eligibility for Chapter 13 are all factors to be considered under the totality of the circumstances test, but they are not the only factors to be considered.[8] On *de novo* review, we find that the record supports the conclusion that the debtor's Chapter 7 bankruptcy proceeding constitutes a substantial abuse. The bankruptcy was filed soon after a divorce, but not in the aftermath of any sudden emergency or decline in income. Although the debtor's debt load is significant in light of the marital debts, he also has the genuine ability to earn significant income and does not dispute the fact that his wife's income is also a proper consideration under § 707(b). In fact, at this writing, he earns about $35,000 at a time when he could earn, by his own admission, a minimum of $80,000 to $100,000 without board certification or completion of the fellowship program. *See* Transcript, p. 183. He hasn't realized this income only because he has chosen to enter a two or three year fellowship. He has deferred income at a time when his monthly expenses exceed his monthly income by $4,500. In any event, the deficiency in income could be remedied in short order with an additional income stream of $45,000, which he could expect to earn as a minimum at this time, without board certification. He has deferred income despite living on family and institutional loans for the last 20 years. And he seeks a discharge of some or all of the marital debt and all of the family loans, asking his children and ex-wife, whose lifestyle was impacted by his 20 years of education, and his former in-laws, who helped support his family during this quest, to once again bear the financial consequences of his personal ambition. In short, he has the current ability to pay, and in the near future his income prospects will increase significantly, with or without the additional fellowship. This, coupled with the circumstances surrounding the bankruptcy filing, and the purpose and use of the debts incurred, justify a conclusion that this case presents a substantial abuse of the provisions of Chapter 7.

---

8. We do not follow those cases that focus exclusively or primarily on but one factor, the debtor's ability to pay the debts. Some courts find that if a debtor is able to pay his or her debts, this fact, standing alone, supports a conclusion of substantial abuse. *See United States Trustee v. Harris,* 960 F.2d 74 (8th Cir.1992); *In re Walton,* 866 F.2d 981 (8th Cir.1989); *Kelly,* 841 F.2d at 915; *Krohn,* 886 F.2d at 123; *see also* S.Rep. No. 65, 98th Cong., 1st Sess. 54 (1983) (§ 707(b) was aimed at debtors who could meet their debts "without difficulty as they come due").

We affirm the decision of the Bankruptcy Court.